# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00973-CV

---

**L. G., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 24DFAM350160, THE HONORABLE DALLAS SIMS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

L.G. (Mother) appeals the trial court's Decree of Termination, which was rendered after a bench trial and which terminates Mother's parental rights to her oldest daughter (Child).[1] The Decree expresses the trial court's findings, by clear and convincing evidence, that (1) the Department of Family and Protective Services undertook certain efforts to return Child to Mother's care and that those efforts were reasonable; (2) Mother committed acts sufficient to establish two of the possible statutory predicate grounds for terminating parental rights, Paragraphs (D) and (K), *see* Tex. Fam. Code § 161.001(b)(1)(D), (K); and (3) terminating Mother's rights to Child was in Child's best interest, *see id.* § 161.001(b)(2).  Mother's appeal concerns most of these findings. But because we conclude that the evidence was legally and factually sufficient to support the

---

[1] The Decree terminates Child's father's parental rights to her, but he has not appealed.

findings about the Department's reasonable efforts to return, the finding under Paragraph (D), and the best-interest finding, we affirm the Decree.

**I**

*A*

Child's parents are Mother and T.B. (Father). By the time of the trial in this suit, Child was 16 years old. Mother has five younger children—one by a different man from Father and four by a third man, J.P.

The Department's request to terminate the parental rights to Child, filed in November 2024, arose out of its receipt of an allegation of neglectful supervision by Mother on a day in August 2024. That day, Mother was to return a sibling to J.P.'s care. Mother felt suspicious that J.P. had taken the child to see another woman. The handoff, according to the Department's caseworker, involved domestic violence between J.P. and Mother. Mother left J.P. at the handoff and drove—with the child—to J.P.'s workplace at 120 miles per hour. When J.P. arrived there shortly after Mother did, he used his vehicle to block Mother's in a parking space. Mother backed her vehicle into J.P.'s, damaging one of its doors.

The ensuing termination suit was not the first involvement by the Department in Mother's and the children's lives. Two years earlier, the Department received and investigated allegations of neglectful supervision and physical abuse by Mother against Child and against one or more of the other children. Although the investigation was ultimately administratively closed, Child's life while in Mother's care has been subject to instances of domestic abuse, including violence by J.P. against Mother. Mother admitted that two of her children by J.P. were conceived as the result of rape. And according to Child's guardian *ad litem*, there was a "history of abusive or assaultive conduct in [Child]'s family."

With this history as background, and around the beginning of this termination suit, Mother was afraid for J.P. to be around the children, and she resisted giving him access to them. Indeed, she admitted that in November 2024, on a day that she went with the younger children to J.P.'s house, she and J.P. "got into another domestic" incident and he "somewhat" chased her and the children "through the streets in a" truck. Yet as the suit progressed and as of trial, J.P. had helped Mother move to Georgia; he had access to her home there, where the other children also lived; and the Department's caseworker believed Mother "still to be with" J.P.

Unlike the other children, who continued to live with Mother in Texas and then in Georgia, Child during this suit was placed with Mother's sister (Aunt) and the sister's husband in Texas. Child participated in family therapy with Mother, among other activities facilitated by the Department. Mother also attended individual-therapy sessions and went through other services arranged by the Department. But throughout the suit, Child consistently wished to stay in Aunt's care and not to go back to Mother's.

The family therapy eventually ceased, on the therapist's advice, and on the eve of a hearing in the suit, Mother surprised Aunt and Child by showing up at Aunt's house. Mother knocked loudly, yelled, and gave Child an affidavit of relinquishment that Mother had signed. The notarized affidavit includes Mother's attestations that she gives up all parental rights to Child, that the affidavit is irrevocable, and that Mother consents to the Department's placing Child for adoption. Being subjected to this conduct by Mother and receiving the affidavit made Child very upset and hurt. Soon after, Mother moved to Georgia.

3

**B**

Trial was to the bench in August and October 2025 on the Department's request to terminate Mother's (and Father's) parental rights to Child.[2] There were three witnesses—the caseworker, the guardian *ad litem*, and Mother. The court admitted into evidence the Department's exhibits, including its Family Plan for Mother, her affidavit of relinquishment regarding Child, and the Department's Final Report to the Court. After the close of the evidence and argument by the parties, the court said on the record that it found that Mother's testimony was not credible.

The court rendered judgment, making the findings detailed above. Mother now appeals, challenging the legal and factual sufficiency of the evidence.

**II**

The findings that Mother challenges on appeal are ones that must be made by the standard of clear and convincing evidence. *See* Tex. Fam. Code § 161.001(b), (f). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

When in suits to terminate parental rights the relevant standard for proof is clear and convincing evidence, legal-sufficiency review of the evidence requires reviewing all the evidence in the light most favorable to the finding under attack, and considering undisputed

---

[2] Earlier in the suit, the five other children went through a court-ordered monitored return to Mother. The Department's requests regarding the four children that she shares with J.P. were severed into a new suit. As for the sole child by the other father, that child was finally returned to Mother's care, and the Department's temporary managing conservatorship for that child was ended. By contrast, Child was never ordered to return to Mother. The court ruled that it was in Child's best interest to stay with Aunt at least through the end of the then-current school year.

contrary evidence, to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Factual sufficiency in the same circumstances, "in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (higher evidentiary burden in parental-rights-termination suits "does not dispel . . . the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility").

## *A*

One of Mother's appellate issues concerns the sufficiency of the evidence surrounding the findings about the Department's reasonable efforts to return Child to her care. This topic is the subject of recent additions to Family Code section 161.001, its new subsections (f) and (g). *See* Act of May 25, 2023, 88th Leg., R.S., ch. 675, §§ 1, 8, 2023 Tex. Gen. Laws 1644, 1644–45. Subsection (f), as relevant here, requires the court to decide whether, by clear and convincing evidence, the Department has made reasonable efforts to return a child to the parent:

> In a suit for termination of the parent-child relationship filed by the Department . . . , the court may not order termination . . . under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that . . . the [D]epartment made

5

> reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent.

Tex. Fam. Code § 161.001(f)(1). Subsection (g) in turn requires that when the suit involves such a continuing danger despite reasonable efforts to return, "the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home." *Id.* § 161.001(g).

Here, the Decree recites the Department efforts to return Child to Mother's care that the court found to be reasonable: "[t]he Department created a family service plan that was narrowly tailored to address any specific issues identified"; "[t]he Department made referrals for services, provided services, or paid for services"; and the Department "provid[ed] family therapy, . . . maintained contact with the mother, [and] provided visitation for the mother and the child." Mother in her appellate briefing acknowledges that the court found that these efforts had in fact been made. Her two-fold appellate challenge about the findings is that there was no evidence that these efforts were reasonable ones and that some of the circumstances surrounding the provision of the family therapy made that particular effort unreasonable. The reasonableness of the Department's efforts under Subsections (f) and (g) may be challenged for legal and factual sufficiency. *See C.Q. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-25-00638-CV, 2026 WL 303008, at *6 (Tex. App.—Austin Feb. 5, 2026, pet. filed) (mem. op.).

As a matter of legal sufficiency, we conclude that the evidence allowed the trial court to form a firm belief or conviction that the Department made reasonable efforts to return Child to Mother. It undisputedly implemented a Family Plan for Mother relating to Child, and that

6

effort is generally "considered a reasonable effort to return the child to the parent." *See D.F. v. Texas Dep't of Fam. & Protective Servs.*, __ S.W.3d __, 2026 WL 482451, at *8 (Tex. App.—Austin Feb. 20, 2026, pet. filed) (mem. op.) (quoting *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.)). In accordance with the Family Plan, the Department set up and paid for individual therapy for Mother and family therapy involving both Mother and Child. The Department also stayed in regular contact with Mother and attempted to place Child with a relative. *See id.* (citing case for proposition that "Department made reasonable efforts to return child to parent by developing service plan, attempting to communicate with parent, and attempting family placement" (citing *A.D.*, 673 S.W.3d at 714)). The Department also provided Mother with opportunities to visit the children, which as an effort in addition to the others also supports the trial court's reasonable-efforts findings. *See C.R.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-25-00750-CV, 2026 WL 844380, at *7 (Tex. App.—Austin Mar. 27, 2026, no pet. h.) (mem. op.).

As for factual sufficiency, the only evidence that Mother points to as undercutting the reasonable-efforts findings concerns the topic of the family therapy. Mother argues that once the Department learned that Mother was moving to Georgia, it should have made efforts to find a therapist licensed in both Georgia and Texas. The argument continues that because the caseworker testified that she asked Mother whether Mother had secured such a therapist but no other evidence shows that such a therapist was successfully secured, the evidence was insufficient to support the reasonable-efforts findings.

As a factual matter, however, Mother's argument ignores other evidence relevant to the end of her family-therapy sessions with the Texas therapist. Among that other evidence is the caseworker's testimony. According to her, although at least two sessions had taken place,

7

Child wanted to end them because they caused her anxiety. At the sessions, Mother would blame Child for their current situation. Her behavior toward Child during the sessions was characterized as "a lot of that was trying to manipulate or coax [Child] to make a decision to come home instead of remain with her aunt." At least one session had to be stopped and Mother removed from the room. Mother's behavior helped lead the guardian *ad litem* to conclude that Child was afraid to go back into Mother's care partly because Mother "is essentially a bully to her and continues to try to coerce her into changing her mind and uses tactics like saying that I'm done with you, I'm going to cut you out of my life." The therapist herself gave a similar account about Mother—as reported by the Department, the therapist was concerned that Mother "has a challenging time being accountable and at time shows that she does not want to see [Child] grow as a young adult and makes [Child] feel guilty for having the wishes that she has for wanting to stay with" Aunt. The account goes on to report of times that the therapist "had to interject in sessions as [Mother] was verbally berating" Child, behavior that "caused [Child] to withdraw." The therapist and Department agreed that the sessions should end because no progress was being made.

Considering this fuller picture of the evidence surrounding the family-therapy sessions, we conclude that the evidence that the trial court could not have credited in favor of its reasonable-efforts findings was not so significant that the court could not have formed a firm belief or conviction that its findings were true. We thus overrule Mother's reasonable-efforts evidence-sufficiency issue.

## B

Another of Mother's appellate issues concerns the Paragraph (D) termination predicate ground. To terminate parental rights, the Department must prove both one of the possible

statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We first set forth some of the law applicable to Paragraph (D) review, and then we detail two topics in the evidence that support the court's Paragraph (D) finding against Mother—domestic abuse touching the home and Child's having suffered significant educational deficits while in Mother's care.

*1*

Paragraph (D) involves a parent's having "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). For these purposes, "'[e]ndanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury," *id.* (quoting *Boyd*, 727 S.W.2d at 533), or even that the conduct happen in the child's presence, *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed."[3] *Pruitt*, 2010 WL 5463861, at *4.

---

[3] Mother argues from a recent opinion from the Supreme Court of Texas that the period relevant to Paragraph (D) analysis can only be the one preceding the child's removal from the parent's care by the Department. The Supreme Court's instruction, however, is more nuanced. To be sure, the Court did observe that "[a]s a general matter," post-removal conditions or surroundings should not work against the parent because "typically, a parent whose child has been removed and

9

"A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being," and "[t]hose risks can be developed by circumstances arising from and surrounding a parent's behavior." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4. Paragraph (D) "permits termination because of a single act or omission." *Castorena v. Texas Dep't of Protective & Regul. Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.).

*2*

As for endangering conditions or surroundings that a parent can place a child in, "[i]nappropriate, abusive, or unlawful conduct by persons who live in the home of the child or with whom the child is compelled to associate on a regular basis in his home inherently is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)." *A.L.-E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00499-CV, 2025 WL 43936, at *3 (Tex. App.—Austin Jan. 8, 2025, no pet.) (mem. op.) (quoting *Castorena*, 2004 WL 903906, at *8).

The evidence here showed a history of domestic abuse in Child's home while living with Mother. The Department described the extreme circumstances in its Final Report:

> The Department is worried that the domestic violence in the home has reached the level of extreme emotional abuse that affects the children in the home and places them at a greater risk of continued emotional abuse that can lead to physical abuse.

who has only supervised visitation has no control over the child's environment." *See In re J.W.*, 645 S.W.3d 726, 745 & n.12 (Tex. 2022). But the Court also instructed that "[t]o the extent the courts of appeals hold that a parent could never cause his child to be placed in an endangering environment after removal, we disagree, as we cannot foreclose the possibility that Subsection (D) could apply post-removal depending on the facts." *Id.*

> The Department is worried that [Mother] was inactive in protecting the children from harm and abuse as she has not shown the priority of the well-being of the children. The Department is worried that if [Mother] continue[s] to place the children in dangerous situations and that [sic] she does have younger children who cannot protect themselves, it could lead to further physical harm.

Still other extreme behavior was visited on Child's life by J.P. The Department in its Family Plan said the following about J.P.'s abuse and its effects on Mother and on the household:

> [Mother] also reports having problems with anxiety related to the past abuse she experienced with [J.P]. She describes many years of physical, mental, emotional, social, financial, and spiritual abuse. She reports, whenever he came around, he would control [her] life [and] . . . would not let [her] go to church, have friends, and make [her] own money. She also notes that he would make her isolated from others and he would engage in numerous physical abuses that included punching her, choking her, pulling her hair, and holding a knife to her. [She] does appear to have PTSD symptoms even though she denies having them.

In light of these experiences, Mother during the monitored return of the other children demanded that J.P.'s visitation be supervised.

Not only was there fallout for Mother from J.P.'s abuse but the same was true also for Child. Evidence showed that Child worried about Mother and J.P.'s continuing relationship. One reason that Child said that she did not want to go back into Mother's care—a desire that she expressed "many, many, many times," the guardian *ad litem* testified—was J.P. And despite it all, evidence showed that Mother remained in a relationship with him even after her move to Georgia, a relationship that allowed him continued access to her home. *See Rios v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00565-CV, 2012 WL 2989237, at *5 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.) ("Termination under subsection (D) is appropriate when the child's environment creates a *potential* for danger of which the parent is aware but disregards.").

11

Neglect can be just as dangerous to the well-being of a child as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam); *T.D. v. Texas Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.). Endangering neglect can exist in a child's conditions or surroundings when the parents fail to see to the child's educational needs. *See C.M.M. v. Department of Fam. & Protective Servs.*, Nos. 14-21-00702-CV, 14-21-00730-CV, 2022 WL 1789925, at *13 (Tex. App.—Houston [14th Dist.] June 2, 2022, pet. denied) (mem. op.); *In re E.M.*, No. 06-17-00083-CV, 2017 WL 5586633, at *5 & n.5 (Tex. App.—Texarkana Nov. 21, 2017, no pet.) (mem. op.); *see also id.* at *5 (noting, as circumstance supporting Paragraph (D) termination, that parents had left children with relatives who "were not able to properly supervise the children," causing children to "miss[] several days of school"); *T.D.*, 683 S.W.3d at 914–15 (applying same principle in Paragraph (E) review and noting, as circumstance supporting termination, that child "needed to go through a school grade one year behind the grade for her age group 'so that she could catch up'" (quoting evidence from trial)).

The evidence here showed a significant lag in Child's educational advancement arising from her time in Mother's care. In fall 2024, Child was enrolled in eighth grade even though she should have been in 10th grade. The Department's Final Report and the caseworker's testimony suggested a marked difference between what Child has been able to achieve academically while in Aunt's supportive care and what Child had dealt with while in Mother's care. The Final Report mentions that now with Aunt, Child has "successfully completed the 9th grade and will be entering the 10th grade this upcoming [2025–26] school year." She passed standardized testing that she had failed while with Mother. Child is now "excited about returning to school and continuing her academic growth," and "[h]er current placement with her

aunt supports her educational goals, and [Child] hopes to remain" there. During the school year that was then upcoming, Child was to be "completing coursework aligned with 11th grade expectation while in the 10th grade," and "[b]ased on [her] progress and performance, there [wa]s a possibility she may be placed in the 11th grade somewhere during the school year." The Final Report also reports a "diagnosis" of "T74.02XD Child neglect, Confirmed," for Child.

*4*

Considering these two topics shown in the evidence—the domestic-abuse-related matters and Child's significant educational lag when with Mother—we conclude that the evidence allowed the trial court to reasonably form a firm belief or conviction that Mother had knowingly placed or knowingly allowed Child to remain in conditions or surroundings that endangered her physical or emotional well-being.

As for factual sufficiency, Mother in her opening brief on appeal does not point so much to evidence in her favor under Paragraph (D). After all, the trial court found her testimony to be not credible. Instead, Mother attacks the quality of the evidence supporting the abuse-related matters. She argues that there was no evidence of any specific instance of abuse aside from one that she admitted to in her testimony. The argument seems to be that there was no evidence of a history of abuse in the home because only one instance of abuse was discussed in detail, and that in Mother's testimony. This argument, however, ignores direct evidence that there was a history of abuse in Mother's home while Child lived there—both the guardian *ad litem*'s testimony and the Department's admitted exhibits directly refer to there having been multiple occurrences of abuse, even if not every occurrence is then explained in detail. The trial court, as factfinder, was

13

within its rights to credit this evidence, and we are not to disturb that decision. *See J.F.-G.*, 627 S.W.3d at 311–12; *A.B.*, 437 S.W.3d at 503.

In her reply brief, Mother relies on the trial court's February 2025 monitored-return order, which returned the five other children to Mother's care but ordered that Child remain in Aunt's care. Mother points out a recitation in the order that "there is no longer a continuing danger to the physical health or safety of the" five other children. Mother also relies on both a severance into a different suit of the case involving J.P.'s children and the ultimate return of the remaining child to Mother's care. Even assuming that these matters constitute evidence in Mother's favor under Paragraph (D), they do not mean that the trial court could not have considered Child's situation to be different from that of her half-siblings. Plus, the February 2025 finding about safety depended on the maternal grandmother's continuing to live in the home with Mother and the other children. And in contrast with the absence of evidence about the other children's wishes, the testimony showed that Child did not want to return to Mother's care and felt that way partly because of J.P.'s continuing involvement in Mother's life. Based on this evidence, the trial court, as factfinder, could reasonably have concluded that J.P.'s acts of abuse uniquely affected Child from among all the children. We conclude that the disputed evidence that the trial court reasonably could not have credited in favor of a Paragraph (D) finding against Mother is not so significant that the court could not have formed a firm belief or conviction that the finding was true.

Therefore, we overrule Mother's Paragraph (D) evidence-sufficiency issue. Because a finding by clear and convincing evidence against Mother under Paragraph (D) suffices as the required predicate-ground finding to support termination, we need not address Mother's evidence-sufficiency issues regarding the Paragraph (K) finding against her. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam).

14

*C*

Mother in her remaining appellate issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating her parental rights to Child was in Child's best interest. When reviewing best-interest findings, factors that courts consider include (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent–child relationship is improper, and (9) any excuses for the parent's conduct. *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exhaustive, not all factors need be proven to establish best interest, and proof of only one factor may in a particular factual context support termination. *See M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *5 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.); *S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). Evidence probative under the statutory predicate grounds may also be probative of best interest, *A.C.*, 560 S.W.3d at 631–32, particularly evidence showing endangerment, *see C.H.*, 89 S.W.3d at 28; *M.L.*, 2023 WL 2025710, at *5.

Under the first factor, the evidence supported termination. According to the guardian *ad litem*, Child expressed "many, many, many times" that she did not want to go back into Mother's care. Other testimony showed that Child wanted Mother's parental rights terminated and wanted Aunt to adopt Child. That Child also expressed a desire to interact with Mother in the future does not outweigh Child's expressed desires about termination and adoption.

15

Under the second, third, fourth, seventh, and eighth factors, we consider significant the evidence that we recounted above under the endangerment predicate ground. *See Bridges v. Mueller*, No. 03-25-00423-CV, 2025 WL 3558566, at *6 (Tex. App.—Austin Dec. 12, 2025, no pet.) (mem. op.); *A.L.-E.*, 2025 WL 43936, at *5.

We also consider significant the fact that Mother voluntarily signed an affidavit of relinquishment of her parental rights to Child, swearing to the matters set forth in the affidavit.[4] A relinquishment "affidavit itself, in the ordinary case, can be ample evidence to support a best-interest determination." *In re K.S.L.*, 538 S.W.3d 107, 111 (Tex. 2017). This is the case "even under a clear-and-convincing standard"—"in the ordinary case a sworn, voluntary, and knowing relinquishment of parental rights, where the parent expressly attests that termination is in the child's best interest, would satisfy a requirement that the trial court's best-interest finding be supported under this higher standard of proof." *Id.* at 112.

---

[4] Mother's two arguments against the conclusion that she signed the affidavit voluntarily are that (1) the Department misled her about whether Child would remain in the Department's conservatorship until age 18 and (2) one of the two witnesses whom Mother chose to witness her affidavit before it was notarized is not a "credible person," *see* Tex. Fam. Code § 161.103(a)(2) ("An affidavit for voluntary relinquishment of parental rights must be . . . witnessed by two credible persons . . . ."). But all the evidence that Mother relies on for her arguments is from her own testimony. Because the trial court found her testimony to have been not credible, Mother's two voluntariness arguments necessarily fail. Separately, Mother argues that her affidavit falls under the rule of *Terrell v. Chambers*, in which the Twelfth Court of Appeals concluded that a relinquishment affidavit was void because its notary, who was the attorney for the parties bringing the termination suit against the parent, "ha[d] a strong financial and beneficial interest in the affidavit." *See* 630 S.W.2d 800, 802 (Tex. App.—Tyler 1982), *writ ref'd n.r.e.*, 639 S.W.2d 451, 451–52 (Tex. 1982) ("We are not to be understood as approving the holding of the Court of Appeals that the affidavit of relinquishment was void because the attorney who acted as the notary to take the affidavits had a 'strong financial and beneficial interest.' Among other things, no financial interest appears in the record. The point is reserved."). Mother, despite quoting from *Terrell* in her briefing, makes no argument that the notary of her affidavit had any interest in the outcome of the termination suit regarding Child. We thus reject this argument as well.

Mother's affidavit of relinquishment makes plain that she has willingly given up her parental rights to Child. The affidavit, among other things, says:

> I was fully informed of my rights, powers, duties, and privileges as a parent before executing this affidavit. . . .
>
> . . . .
>
> I HEREBY RELINQUISH ALL MY PARENTAL RIGHTS TO THE CHILD.
>
> THIS AFFIDAVIT IS IRREVOCABLE.
>
> I UNDERSTAND THAT THIS MEANS THAT I CANNOT CHANGE MY MIND AND ASK FOR THE RETURN OF MY CHILD.
>
> I execute this affidavit freely and voluntarily because I deem it to be in the best interest of the child to terminate the parent-child relationship between myself and the child.
>
> I agree to the termination of my parental rights, and deem it to be in the best interest of the child, that my parental rights be terminated.
>
> . . . .
>
> I consent to the placement of the child for adoption by the [Department] or by an agency authorized by the [Department] to place child for adoption.

Mother did not stop at signing the affidavit and having it notarized. She then drove to Aunt's home; yelled at Child; handed Child the affidavit; and told Child that (as related by the guardian *ad litem*) "they were over, they were done." The guardian *ad litem* also testified that the affidavit was not the Department's idea originally but was Mother's. *See S.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-13-00151-CV, 2013 WL 3013874, at *3 (Tex. App.—Austin June 12, 2013, no pet.) (mem. op.) ("[A]n affidavit of relinquishment, in and of itself, can provide sufficient evidence that termination is in a child's best interest.").

Mother's arguments on appeal under the best-interest requirement are unavailing. Many of them rely on her own testimony from trial. Because the trial court found her testimony not to have been credible, any reliance on her own testimony is misplaced.

Mother argues that the evidence cannot support the best-interest finding because the trial court did not conduct an in-chambers interview with Child under Family Code section 153.009. To begin with, Mother points to nothing in the record showing that anyone applied for the court to conduct an in-chambers interview. *See* Tex. Fam. Code § 153.009(a), (b) (interview can be initiated on application of party, amicus attorney, or attorney *ad litem*). And a judgment terminating parental rights to a child who is age-eligible for a Section 153.009 interview may be affirmed even without resort to any material gleaned from a Section 153.009 interview. *See, e.g.*, *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00510-CV, 2024 WL 589907, at *14 (Tex. App.—Austin Feb. 14, 2024, no pet.) (mem. op.) ("Our analysis of Julie's prior issues concluded that the evidence was legally and factually sufficient to support the trial court's endangerment and best-interest findings without considering statements that Rose made during the in-camera interview."); *In re T.H.*, No. 09-17-00200-CV, 2017 WL 4844512, at *7 (Tex. App.—Beaumont Oct. 26, 2017, pet. denied) (mem. op.) (affirming judgment terminating parental rights, including by concluding that evidence was sufficient to support best-interest finding, even though trial court had refused party's application for in-chambers interview of child who was of age that afforded trial court discretion about whether to interview child).

Finally, Mother relies on the trial court's monitored return of the other five children to her care. Even assuming that this may constitute evidence in her favor concerning Child's best interest, we conclude that it does not outweigh the other evidence that we have recounted.

Therefore, we conclude under the legal- and factual-sufficiency standards that the trial court's finding that it was in Child's best interest to terminate Mother's parental rights to her was supported by the evidence. We thus overrule Mother's last appellate issue.

\*        \*        \*

We affirm the trial court's Decree of Termination.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Ellis

Affirmed

Filed: May 22, 2026